UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RUTH REITER,

        Plaintiff,

  v.                                                    Case No. 09-C-239

OSHKOSH CORP., et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff Ruth Reiter ("Reiter"), an employee of Defendant Oshkosh Corporation ("Oshkosh"), filed various claims against the company and three of its employees. Reiter has filed claims of slander, tortious interference with her contract, and intentional infliction of emotional distress against Defendant Jeffrey Weisjohn ("Weisjohn"). Reiter also filed claims of retaliation and tortious interference with an employment contract against Defendant James Gardiner ("Gardiner") and Defendant Rod Wedemeier ("Wedemeier"). Finally, Reiter has filed a Title VII sexual harassment claim against Oshkosh Corporation on the basis that a hostile work environment was created.

Specifically, Reiter claims that Weisjohn sexually harassed her by spreading rumors throughout Oshkosh Corporation that the two parties had a sexual affair. Reiter claims that this sexual harassment also resulted in intentional infliction of emotional distress, slander, and interference with her employment contract by Weisjohn. Additionally, Reiter specifically claims

that in response to her complaining about Weisjohn's sexual harassment, Wedemeier and Gardiner retaliated against her and interfered with her employment contract. Finally, Reiter claims that the rumors spread by Weisjohn created a hostile working environment which Oshkosh Corporation failed to reasonably remedy to prevent future harassment, creating liability for the corporation under Title VII sexual harassment. This case is before the Court on the Defendants' motion for summary judgment.

**I. Background**

Oshkosh Corporation is headquartered in Oshkosh, Wisconsin, and specializes in the design and manufacture of truck bodies for various uses including military defense and fire and emergency services. Oshkosh Corporation has eight main buildings, including North Plant, Harrison Plant, and the 20th Street Plant. Reiter was hired by Oshkosh in 1982, and currently works as an administrative assistant in the Health Services Department. Weisjohn is a Materials Facilitator at Oshkosh who is not, and never has been, a supervisor of Reiter.

Reiter and Weisjohn have known each other as friends since 2003. Their relationship started to have "excessive contact" beginning in 2005. During this time, the two parties had what was described as an "emotional affair." They exchanged multiple gifts between 2005 and 2006. Reiter gave Weisjohn a pair of underwear, a father's day card with a picture of Reiter sitting on a bed, a sweetest day card, a piece of jewelry with the words "It would be you and only you," inscribed, and a lock box to store all of her gifts in. (DPFOF ¶ 26.) In return, Weisjohn gave Reiter a pair of his underwear, a mother's day card, a sweetest day card, and a CD entitled "You are beautiful." (DPFOF ¶ 27.)

During the time that the two parties exchanged gifts, their relationship also became more physical. The two parties would meet privately, at various locations, such as public parks, a home that Weisjohn was house-sitting, and at a dead end close to both of their homes. During these private meetings, their relationship became physical as the two parties kissed, hugged, and also lay closely together in the back of Weisjohn's pick-up truck, all of which Reiter consented to and welcomed.

The relationship began to unravel in 2006 when Reiter's husband began to believe that she and Weisjohn were having an affair. Mr. Reiter became suspicious after he discovered the Mother's Day card that Weisjohn gave to Reiter. At this time, Mr. Reiter went to his supervisor, a Mr. Freiberg, to investigate whether Weisjohn was sending e-mails to Ruth Reiter during working hours. After discovering that both parties had sent multiple e-mails to each other during working hours, Weisjohn was disciplined with a written warning to stop e-mailing Reiter on company time. Reiter received no disciplinary action regarding the excessive e-mails.

Weisjohn discontinued the e-mails to Reiter, and their relationship seemed to end. However, on November 30, 2007, Mr. Reiter was told that his wife was having an affair with Weisjohn by another co-worker, Doug Kortbein. Ruth Reiter was supposed to be at a doctor's appointment, and upon hearing the rumor Mr. Reiter decided to check on his wife. When Mr. Reiter arrived at the medical center, Weisjohn's truck was also in the parking lot. This was apparently a terrible coincidence, but Mr. Reiter believed they were there together and proceeded to cause about $4,000 in damage to Weisjohn's truck with a tire iron. After this incident, Ruth Reiter began to ask other employees what rumors they had heard, and three employees confirmed that they had heard Reiter had an affair with Weisjohn.

On December 3, 2007, Reiter contacted Gardiner, Oshkosh's Human Resources Director, and requested to meet with him about a concern she had with a co-worker. Gardiner met with Reiter three days after her request. During their meeting, Reiter told Gardiner that Weisjohn had been spreading rumors that the two parties had an affair and it was not good. Reiter told Gardiner that she wanted Weisjohn transferred to another Oshkosh plant. However, Reiter did not request that Weisjohn receive any additional discipline. The next day, Gardiner met with Weisjohn. Weisjohn denied spreading any rumors concerning an affair with Reiter, and explained the only contact he had with Reiter in the past ten months was to have something removed from his eye, as Reiter worked in the health service department at that time. Gardiner then explained that Weisjohn was to have no contact with Reiter, and make no comments regarding the situation to co-workers.

After the December 7, 2007 meeting with Weisjohn, Gardiner began exploring ways to transfer Weisjohn. Before the transfer occurred, Reiter contacted Bob Bohn, the CEO of Oshkosh Corporation, to express her concerns about Weisjohn. This prompted Wedemeier and Gardiner to bring Reiter into their office to tell her that she needed to contact Human Resources, not the CEO, to handle these issues. Reiter claims that Wedemeier yelled at her at this meeting. However, Reiter received no discipline whatsoever resulting from this meeting.

After completing his investigation, Gardiner finally determined that Reiter and Weisjohn had a relationship, that their relationship had deteriorated, and that the problem was intensified by the fact that they both worked at the same plant. Therefore, Gardiner transferred Weisjohn to the Harrison Street Plant on January 8, 2008. This transfer came a month after Reiter's original request, but was delayed by the Christmas holiday and the fact that Gardiner was on vacation from December 20, 2007 until January 2, 2008.

4

After the transfer, there were a few more instances where Reiter was either concerned about having contact with Weisjohn or claimed that Weisjohn attempted to contact her. Oshkosh Corporation promptly addressed all of these concerns. On February 1, 2008, Reiter notified Gardiner that she would be at the Harrison Plant the next week to hand out ear plugs. Gardiner e-mailed Reiter back the next day, informing her that two supervisors at the Harrison Plant had been informed of the situation, and that she should contact him if anything occurred while she was there. Nothing inappropriate occurred while Reiter was at Harrison Plant, and she never contacted Gardiner about the trip.

Then, on March 19, 2008, Reiter e-mailed Gardiner telling him that Weisjohn had been observed at North Plant on February 27, that Weisjohn was in his vehicle near her children's school on March 4, 2008, and that Weisjohn was at a Hollywood Video store at the same time that Reiter was there on March 16, 2008. Reiter never made eye contact or had any conversation with Weisjohn during these incidents. Because the last two incidents occurred off of Oshkosh's property, Gardiner informed Reiter that she should contact the police, which she never did.

Finally, on April 7, 2008, Reiter e-mailed Gardiner that she had been informed that Weisjohn would be moving back to the 20th Street Plant. Weisjohn was transferred to the 20th Street plant for approximately two hours before being transferred back to Harrison Plant after a slight mix-up. Reiter neither saw nor had any contact with Weisjohn during this two hour time period that he was transferred back to the 20th Street Plant. The only other conduct Reiter complained about regarding Weisjohn was a fifteen second prank phone call she received at her home in November of 2008. It was never confirmed that Weisjohn made the call, and Reiter alleges no other contact with Weisjohn after this incident.

5

**II. Analysis**

Oshkosh Corporation claims it is entitled to summary judgment because Reiter has failed to establish the necessary elements for sexual harassment under Title VII, Reiter failed to respond with her own proposed findings of fact, and Reiter's claims of sexual harassment based on marital status and retaliatory termination are barred because they were raised in her response brief, not her original complaint. Gardiner and Wedemeier claim they are entitled to summary judgment because Reiter has failed to establish the elements for tortious interference with an employment contract and has failed to establish the elements for retaliation. Weisjohn claims that he is entitled to summary judgment because the Worker's Compensation Act is the exclusive remedy for intentional infliction of emotional distress and slander and that Reiter has failed to establish the necessary elements for tortious interference with an employment contract. Each contention will be addressed in turn.

**A. Hostile Work Environment/ Sexual Harassment Against Oshkosh**

Title VII of the Civil Rights Act of 1964 prohibits any action by an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals … sex …" 42 U.S.C. § 2000e-2(a)(1). Discrimination under Title VII can be direct and specific, or it may arise under a hostile work environment. To establish a prima facie case of a hostile work environment, the plaintiff must show:

> (1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal and physical conduct of a sexual nature, (2) the conduct was severe or pervasive enough to create a hostile working environment, (3) the conduct was directed at her because of her sex, and (4) there was a basis for employer liability.

*Whitaker v. Northern Illinois Univ.,* 424 F.3d 640, 645 (7th Cir. 2005). When considering if a hostile work environment exists, a court will evaluate the following factors: "(1) the frequency of

6

the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 534 (7th Cir. 1993) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993)). The court's focus "is necessarily on the totality of the circumstances … no single factor is required." *Id.*

Further, there are few instances that allow mere rumors or sexual banter to establish a hostile working environment. In *Baskerville v. Culligan Int'l Co.,* the Seventh Circuit held that, "[the] occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers … would be neither pervasive nor offensive enough to be actionable." *Baskerville v. Culligan Int'l Co,* 50 F.3d 428, 431 (7th Cir. 1995) (citations omitted).

In the present case, Reiter's claim of sexual harassment under a hostile working environment fails on multiple grounds. First, she fails to establish that the rumors created a hostile working environment. Reiter relies on *Jew v. University of Iowa* to establish that rumors of a sexual nature can create a hostile working environment. However, this case is distinguishable from *Jew.* In *Jew*, the rumors lasted for thirteen years, and included faculty members yelling sexual slurs at the plaintiff in the hallway, faculty members posting cartoons depicting the plaintiff in sexual acts with another faculty member on office doors, and writing sexual slurs about the plaintiff in the bathroom regarding a supposed affair with another faculty member. *Jew v. University of Iowa*, 749 F. Supp 946, 958 (S.D. Iowa 1990). This was despite the fact that there was no evidence that the plaintiff ever had an affair with the other faculty member. *Id.* The court in *Jew* held that these rumors created a hostile working environment and the plaintiff had an actionable sexual harassment claim under Title VII. *Id.*

7

Distinguishable from *Jew,* the rumors in the present case were based on an actual relationship that Reiter and Weisjohn engaged in, and were limited to the rumor that they had engaged in sexual relations. Importantly, Reiter and Weisjohn *were* having a physical relationship. Whether or not there was a sexual consummation of the affair, the two were stealing off to secret places to kiss and hug, and they exchanged presents that included underwear and inscribed jewelry, as well as cards and notes suggestive of a relationship that was much more than just friendly. If other employees drew the inference that they were having a sexual affair, they can hardly be blamed.

And if Reiter's claim is that Weisjohn spread the false rumor that they had had sex when they had not, there is no evidence directly linking Weisjohn to the spreading of false rumors about their relationship. Reiter's husband was the one who initiated the inquiry into their e-mails, and it would not be surprising if news of his damage to Weisjohn's truck spread throughout the plant. She herself admitted that the truck incident was "part of the conversations" that were going on at the plant. (R. Reiter Dep. at 208.[1]) Weisjohn was disciplined for sending excessive e-mails to Reiter during work hours, and employees had heard that Reiter's husband had caused significant damage to Weisjohn's truck. Weisjohn and Reiter had engaged in other behavior at work that was consistent with a sexual affair. Other employees thus had ample reason to believe that the two had engaged in a sexual affair (even if they did not), and there is no evidence that Weisjohn himself spread these rumors.

Moreover, Reiter has not cited any cases that would allow an employee to engage in conduct that gives rise to rumors and then use those very rumors as the basis of a hostile work environment claim. Wholly apart from the First Amendment concerns that might arise, it is not slanderous (and

---

[1] Dkt. # 45, Attachment 2.

8

thus hardly "hostile") for employees to merely confirm that they had heard rumors about activities that the Plaintiff herself either engaged in or appeared to engage in. In other words, if an employee acts in a manner that justifies the conclusions that others draw about her conduct, the work environment that results cannot be deemed "hostile" unless the other employees do more than simply confirm that they had heard rumors. Here, there is no suggestion that Reiter was taunted or otherwise harassed. The complaint is simply that Reiter was unhappy with rumors about her that were circulating, and those rumors were either true or were based in facts that would reasonably justify people believing them to be true.

Finally, it is clear that the rumors at issue here do not rise to the level of a hostile work environment. First, the rumors only lasted a limited time compared to the thirteen year time span in *Jew*. Reiter gives no evidence that the rumors persisted after November 30, 2007, and Reiter provides no indication of when they started before that time. Further, the undisputed facts show that Reiter admits that all she heard was that Oshkosh employee Danny Kibbons had heard "crazy, nasty, stuff," and that Doug Kortbein had heard another employee state that he heard Weisjohn had sex with Reiter. This is also distinguishable from *Jew* as the plaintiff in that case was referred to as a "slut," "bitch," and, "whore," amongst other sexual epithets. Finally, there is no evidence that any employees sought to actually make the workplace a hostile one. Even if a rumor was circulating, there is no indication that any other employees attempted to make fun of her or taunt her about it. In fact, much of the evidence of the rumor seems to have resulted from her own questioning of other employees.

Distinguishing the facts of the present case from *Jew* shows that the rumors were not frequent, they were not severe, and that they were at worst mere offensive utterances. Finally,

9

Reiter gives very little evidence of how these rumors unreasonably interfered with her work performance. The only evidence she gave were her own affidavits stating that other co-workers would smirk at her or laugh as she walked by. The rumors against Reiter fail on every *Harris* factor to establish a hostile working environment, and I therefore conclude that a reasonable jury could not conclude that Reiter worked in a hostile working environment.

Even though there is no hostile work environment in this case, even if one existed, Reiter cannot establish liability on the part of Oshkosh Corporation. When a hostile environment is created by a co-employee, an employer can avoid liability if it can show it took, "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Tutman v. WBBM-TV, Inc./CBS Inc.,* 209 F.3d 1044,1048 (7th Cir. 2000) (citing *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 535 (7th Cir. 1993)). When evaluating whether an employer can avoid liability under Title VII, the question is not whether the Plaintiff was satisfied with the employer's response, but rather whether the employer's response was reasonably calculated to prevent future harassment. *Saxton* 10 F.3d at 535.

In the present case, Oshkosh took prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring. First, Oshkosh answered all of Reiter's complaints in a timely fashion. Management then transferred Weisjohn to another plant to separate the two parties. The transfer did take a month, but this was only because of the holiday season and the fact that Gardiner was on vacation for two weeks during that time. Second, all subsequent complaints were handled promptly as well. When Weisjohn was transferred back to the 20th Street Plant, he was transferred back to Harrison Street within two hours. When Reiter complained of Weisjohn "stalking" her outside of work, Gardiner promptly advised Reiter to inform the police, which she

10

failed to do on her own. Oshkosh Corporation's remedial action of separating the two parties was reasonably calculated to prevent future harassment; therefore Oshkosh avoids liability under Title VII.

Finally, Reiter fails to establish that the harassment occurred because of her sex. This case is very similar to the situation in *Pasqua v. Metropolitan Life Insurance Co.*, where the Seventh Circuit granted summary judgment to the defendants after the plaintiff alleged sexual harassment based on rumors he had a sexual affair with another co-worker. *Pasqua v. Metropolitan Life Insurance Co.*, 101 F.3d 514 (7th Cir. 1996). The court observed that to prevail the plaintiff would have to show that the rumors spread because of his sex, but noted that the gossip involved both the plaintiff and his female subordinate, and the rumors spread, "[for] any number of reasons having nothing to do with gender discrimination." *Id* at 517. Similar to *Pasqua,* Reiter has failed to establish that the rumors were spread because she is a female. Instead of evidence, all we have in the record are conclusory statements in which she claims she was discriminated against because of her sex.

Reiter has failed to establish three of the necessary elements for a hostile work environment sexual harassment claim under Title VII. Therefore, Reiter's hostile work environment claim will be dismissed.

**B. Retaliation**

Reiter also claims that she was retaliated against by Gardiner and Wedemeier for filing complaints regarding the rumors that Weisjohn started. To succeed on a claim of retaliation, Reiter must show that (1) she engaged in statutorily protected activity, (2) she had satisfactory job performance, (3) she suffered an adverse employment action, and (4) there exists a causal link

11

between the protected activity and the adverse action. *Griffin v. Potter*, 356 F.3d 824 (7th Cir. 2004).

In the present case, Reiter's claim of retaliation against Gardiner and Wedemeier is baseless. Reiter fails to show that she had any adverse employment action resulting from filing her complaint against Weisjohn. The only evidence that Reiter gives of an adverse employment action is when Wedemeier "yelled" at her for contacting the CEO about the situation. However, it is questionable that Reiter was even yelled at, as in her own deposition she admits that Wedemeier said in a stern, professional voice, "This is an HR issue and you have no business contacting a CEO of a corporation of 12,000 people." (R. Reiter Dep., p. 68 at ll 6-8.[2]) Further, Reiter gives no evidence of reduced pay, transfers, loss of hours, or any other action that would suffice to show an adverse employment action. Because there are no facts indicating that Reiter suffered an adverse employment action, Reiter's retaliation claims will be dismissed.

**C. Retaliatory Termination/Sexual Harassment Based on Marital Status**

In her response to Oshkosh's motion for summary judgment, Reiter added the claims of retaliatory termination and sexual harassment based on marital status. The Court will not consider either of these claims. The federal pleading rules require that the plaintiff give the defendant fair notice of what the claims against the defendant will be and what grounds those claims rest on. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). In other words, the complaint must fairly notify the defendant of what the matters litigated will be, and a new claim cannot be asserted by the plaintiff in a response to the defendant. *Conner v. Ill. Dep't of Natural Res.,* 413 F.3d 675 (7th Cir. 2005).

---

[2] Dkt. # 57, Attachment 1.

Additionally, after filing an EEOC complaint, the lawsuit must be tailored to the grievances that the complaint originally laid out. *Id.* The test that the Court will implement is whether a "reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek V. Western and Southern Life Ins. Co.,* 31 F.3d 497, 501 (7th Cir. 1994). This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals. *Id.*

Reiter failed to assert these claims in her original complaint, and as stated above, claims asserted for the first time in a response will not be considered. *See e.g. Conner v. Ill. Dep't of Natural Res.,* 413 F.3d 675 (7th Cir. 2005) (holding that a claim raised for the first time in a response to summary judgment will not be considered), *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (holding that plaintiff "may not amend his complaint through arguments in his brief of opposition to a motion for summary judgment"), *E.E.O.C. v. Lee's Log Cabin, Inc.,* 546 F.3d 438 (7th Cir. 2008) (holding that the plaintiff could not change the word "HIV" to "AIDS" in its response.)

Finally, as noted earlier, Reiter has failed to provide proposed findings of fact. As such, even if she were allowed to amend her complaint by virtue of her summary judgment brief, there is no evidence in the record supporting, or even suggesting, the notion that she was discriminated against because of her marital status. The facts suggest instead that rumors began to circulate after Reiter's husband damaged Weisjohn's truck and she began asking what people had heard.

Additionally, Reiter asserts that these claims should be allowed because they are reasonably related to her original EEOC charge. Although this may true, it is not necessary to complete this

13

analysis because those claims were never brought up in the original complaint. The "reasonably related" test only applies to claims pleaded in the original complaint. Reiter failed to plead either of these claims in her original or amended complaint, and did not assert them until her response to Oshkosh's motion for summary judgment, therefore they will not be considered by the Court.

Having disposed of Reiter's federal claims, the usual practice would be to relinquish federal supplemental jurisdiction over her state law claims so as to minimize the occasions for federal judges to opine on state law. *See Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997) ("The general rule is that when as here the federal claim drops out before trial (here way before trial), the federal district court should relinquish jurisdiction over the supplemental claim."). There are exceptions to this general rule, however, one of which has been referred to as the "no brainer" exception. "If . . . an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case." *Id.* (citing *Boyce v. Fernandes*, supra, 77 F.3d 946, 951 (7th Cir. 1996); *Bowman v. City of Franklin*, 980 F.2d 1104, 1109-10 (7th Cir. 1992)). This exception applies here. Reiter's state law claims are easily disposed of under well established state law principles. Accordingly, the Court will proceed to address those claims as well.

**D. Tortious Interference With Employment Contract**

Reiter also claims that Weisjohn, Gardiner, and Wedemeier tortiously interfered with her employment contract. To establish a prima facie case of tortious interference with a contract, the plaintiff must show that (1) the plaintiff had a contract with a third party, (2) the defendant

14

interfered with the relationship, (3) the interference was intentional, (4) a casual interference exists between the interference and the damages, and (5) the defendant was not justified or privileged to interfere. *Dorr v. Sacred Heart Hosp.* 597, N.W. 2d 462, 478 (Wis. Ct. App. 1999).

Reiter's claims of tortious interference with her employment contract are groundless. Although a claim of tortious interference can be upheld for an at-will employee, *Mackenzie v. Miller Brewing Co.*, 608 N.W.2d 331 (Wis. Ct. App. 2000), Reiter has failed to show what damages she incurred or what interference actually existed from any of the three defendants. Reiter states that Gardiner tortiously interfered with her employment contract by not following up on her complaints about Weisjohn in a timely manner, and by yelling at her for being a "horrible employee" in 2005. Reiter states that Wedemeier tortiously interfered with her employment contract by "reprimanding" her after she approached the company's CEO about the situation with Weisjohn. Finally, Reiter claims that Weisjohn tortiously interfered with her employment contract by making it more difficult for her to perform her work duties.

Despite these claims, Reiter gives no specific evidence of how these actions interfered with her work performance or any damages that were related to these actions. Reiter gives no examples of reduced wages, reduced hours, time missed from work because of their activities, or any indication that their actions had an adverse effect on her work performance. In fact, Reiter's own testimony shows that she received good performance reviews during this time period. (R. Reiter Dep. p.154-155.) Therefore, Reiter's claims of tortious interference with her employment contract must be dismissed because she has given no evidence of any actual interference with her employment, or any damages suffered from the supposed interference.

15

**E. Intentional Infliction of Emotional Distress/Slander**

Reiter also claims that Weisjohn is liable for intentional infliction of emotional distress and slander. However, these claims will be dismissed because they are under the exclusive remedy of the Worker's Compensation Act ("WCA"). When the provisions of liability under the WCA are met, the exclusivity provision requires that, "the right to the recovery of compensation under this chapter shall be the exclusive remedy against the employer, any other employee of the same employer and the worker's compensation insurance carrier." Wis. Stat. § 102.03(2). Wisconsin case law has consistently extended the exclusivity provision to include intentional infliction of emotional distress and slander, *see e.g. Becker v. Automatic Garage Door Co.* 456 N.W.2d 888 (Wis. Ct. App. 1990) (holding that defamation claims against co-workers are preempted by the WCA), *Jenson v. Employers Mut. Casualty Co.* 468 N.W. 2d 1 (Wis. 1991) (holding that intentional infliction of emotional distress claims against co-workers are preempted by the WCA). It is also established that an exception to the exclusive remedy of the WCA only exists for assaults intended to cause bodily harm. *Becker* 456 N.W. 2d at 892.

To fall under the WCA, an employee must have sustained an "injury." Wis. Stat. § 102.03(1). "Injury" is defined under the WCA as "mental or physical harm to an employee caused by accident or disease." Wis. Stat. § 102.03(2)(c). Additionally, to meet the provisions of liability under the WCA, the injury cannot be self-inflicted, the injury must have arisen out of the employee's conduct, and at the time the injury occurred, the employee must have been performing services incidental to his or her employment. Wis. Stat. § 102.03.

Reiter claims that she is not within the exclusivity provision for two reasons. First Reiter claims that Weisjohn harassed her off of Oshkosh Corporation's property and outside of working

16

hours. Reiter relies on *McRae v. Porta Painting*, a case in which the court held that an employee would not fall under the provisions of the WCA when he was injured in an accident while driving to work. *McRae v. Porta Painting,* 769 N.W.2d 74 (Wis. App. 2009). Although Reiter is correct in asserting that activity occurring off work premises and outside of working hours is not incidental to employment and is therefore not covered by the WCA, this does not apply to the present case. There is no assertion that Weisjohn ever spread rumors outside of the Oshkosh plant or ever approached her outside of working hours. Reiter does give examples of times where she happened to see Weisjohn outside of working hours or away from the Oshkosh plant, but during those encounters she never made eye contact with Weisjohn or communicated with him. (Oshkosh PPOF ¶ 108.) Reiter has given no proof that Weisjohn spread any of the rumors outside of work, therefore this argument fails.

Reiter also contests that she and her husband expected the injuries that resulted from Weisjohn because he stated, "Not so nice Jeffy will come out." As Reiter indicates, another requirement of the WCA is that the injury occurs by accident. "Accident" under the WCA has been defined as, "… a fortuitous event, unexpected and unforeseen by the injured person. The Industrial Commission clearly held that even though the injury might be intentionally inflicted by another, if the injury is unexpected and unforeseen by the person injured it was an accident within the compensation act." *Jenson* 468 N.W. 2d at 6. Reiter therefore argues that her claim is not barred by the WCA because she expected the rumors to begin and the injury was therefore not an accident under the act.

Again, although this argument may have merit, Reiter fails to establish any evidence in the record that this assertion is true. The facts clearly show that the only reason Reiter may have

17

anticipated that the rumors would spread through Oshkosh was because her husband damaged Weisjohn's truck the day before they began. Additionally, most of Reiter's argument of anticipating the harm focuses on the fact that Mr. Reiter supposedly anticipated that Weisjohn would harass Mrs. Reiter in the future. Reiter's response to Weisjohn states,

> "He (Weisjohn) made a habit of harassing Jeff Reiter during the lunch hour. Eventually, Jeff Reiter came to anticipate that he would see Weisjohn going to and from work at lunch. After the final incident on November 23, Jeff Reiter expected Weisjohn would make trouble for he and Ruth Reiter by complaining to his co-workers. This is exactly what happened. After the Reiters heard what Weisjohn had been saying, they anticipated the rumor would spread throughout the plants operated by the Company and they would face a hostile work environment."

(Reiter Resp. to Weisjohn, p.6.)

Along with failing to provide evidence of how Reiter anticipated the rumors would spread, Reiter also fails to give any evidence of how the rumor spread through the plants operated by the company. The undisputed facts clearly show that at most three people knew about the rumor, and they were located in two of Oshkosh's plants, 20th Street and Harrison. (Oshkosh PPOF ¶ 50). Further, Reiter herself admits that the rumors only lasted for a short time and ended on November 30, 2007. (Oshkosh PPOF ¶ 51). Even if Reiter anticipated that the rumors would spread "throughout the plants operated by the Company," the undisputed facts show that this never happened and what she expected did not occur. Finally, Reiter claims that Weisjohn's statements were slander per se, however, this is irrelevant because the slander claim is preempted by the WCA. Therefore, this argument fails as well and Reiter's claims of intentional infliction of emotional distress and slander will be barred by the exclusivity provision of the WCA.

18

**III. Conclusion**

Reiter has failed to offer her own proposed findings of fact or establish in any way that there are genuine issues of material fact regarding her claims. Most of the claims in Reiter's briefs are conclusory assertions supported by no evidence. The mere fact that other employees acknowledged that rumors were circulating about her behavior cannot itself constitute a hostile work environment. And there is simply no evidence that Weisjohn spread rumors that weren't true. Therefore, summary judgment is granted for all defendants. The Clerk is directed to enter judgment in favor of the defendants and against the plaintiff dismissing all claims with prejudice.

**SO ORDERED** this   22nd   day of July, 2010.

>   s/ William C. Griesbach
> William C. Griesbach
> U.S. District Judge